# Illinois Official Reports

## Appellate Court

*People v. Hamilton*, 2019 IL App (1st) 170019

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC HAMILTON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-0019 |
| Filed<br>Rehearing denied | December 13, 2019<br>January 8, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-609; the Hon. Kevin M. Sheehan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Daniel H. Regenscheit, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |

Panel
JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Mikva concurred in the judgment and opinion.
Justice Connors dissented, with opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Eric Hamilton, was convicted of first degree murder and sentenced to 55 years' imprisonment. On appeal, the defendant contends that (1) he received ineffective assistance of counsel, (2) he was unfairly prejudiced by witness testimony, and (3) the trial court did not provide proper Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) admonishments during *voir dire*. For the following reasons, we reverse the judgment of the circuit court of Cook County and remand the case for a new trial.

¶ 2                                      BACKGROUND

¶ 3    The State charged the defendant with first degree murder for the death of Guvonni Johnson on December 8, 2014. The defendant retained counsel, who claimed that the defendant shot Johnson in self-defense. A jury trial commenced, and the following evidence was presented.

¶ 4    On the morning of December 8, 2014, the defendant picked up his fiancée, Nikita Robinson, from her job and drove her home. When they arrived at the house, located at 6103 South Wabash Avenue, Chicago, Illinois (the house), Guvonni Johnson was there. Johnson was Robinson's brother, who had lived with Robinson at the house for the past several months. An argument ensued between Johnson and Robinson over a bus pass. The defendant joined the argument to support Robinson, and things became heated between him and Johnson.

¶ 5    The defendant stepped outside and called the police. Chicago police officer John Block arrived at the house a few minutes later. Robinson and the defendant told Officer Block that they wanted Johnson to leave the house. However, Officer Block declined to remove Johnson or make him leave. After talking with everyone for about 20 minutes, Officer Block left the house.

¶ 6    The argument continued between the defendant and Johnson once Officer Block left. Robinson then told both men to leave the house. Once outside of the house, the defendant and Johnson engaged in a physical altercation. Johnson eventually entered his car, a red PT Cruiser, and drove away. The defendant followed in his car, a white PT Cruiser. After a few minutes, both men drove back to the house and parked their cars. Words were exchanged between them on the street. The defendant then shot and killed Johnson outside of the house. No gun was found on Johnson or at the crime scene.

¶ 7                                   The State's Case

¶ 8    Robinson testified on behalf of the State. After she told both men to leave the house, she watched the physical altercation between them from inside the house. Johnson punched the defendant in the jaw, which knocked out the defendant's tooth, and then Johnson spit in the defendant's face. The defendant pushed Johnson away from him and swung at him but missed.

Robinson then went outside to try to stop the fight but was unable to do so and it continued. She went inside the house and called the police. She was on the telephone with the police for a few minutes when she heard the front gate outside of the house crash to the ground. She looked outside and saw that Johnson had knocked the defendant into the gate, which broke it. Robinson went back outside as the two men continued to fight in the street. She went up to them to try to physically break up the fight once again, but she was hit by one of the punches thrown. She went back into the house and called the police again.

¶ 9        About five minutes after Robinson went back inside the house, she heard three gunshots. She looked out the front window of the house and saw Johnson lying on the ground in front of his car. The defendant then knocked on the back door of the house. Robinson opened the door, and the defendant told her "I'm sorry, I love you." Robinson told the defendant to turn himself in, and he left.

¶ 10       Robinson testified on direct examination that she did not see either man with a gun on that day. On cross-examination, defense counsel asked her: "Had you ever seen [Johnson] with a gun?" Robinson answered, "Yes." The State objected and the trial court sustained the objection. Defense counsel requested a sidebar, and the trial court asked defense counsel why he should be allowed to ask Robinson if she ever saw Johnson with a gun:

> "[DEFENSE COUNSEL]: I believe the State opened the door. They said there were a couple of questions. Did you ever see him on that day with a gun? Did you ever see him—
>
> THE COURT: Well, that's relevant because you had filed a defense of self defense for that particular day.
>
> [DEFENSE COUNSEL]: I just believe, Judge, I should be able to ask if she ever saw [Johnson] with a gun. They lived together for eight months and it shows he may have possessed a gun at some point and he may have had a gun—if he possessed a gun at some point prior, then he may have had a gun on that day.
>
> THE COURT: That calls for sheer speculation. State['s] response.
>
> [THE STATE]: First of all, in the defendant's opening statement, they indicated that this defendant saw [Johnson] supposedly carrying his waistband as if he had a gun. Thus the question[,] [']did you see [Johnson] on that day carrying a gun.['] Secondly, even if [Johnson] had no criminal background, even if he had a criminal conviction for possession of a gun, case law is clear [that possession] does not go towards violence. It doesn't go to *Lynch* material. This is nothing but to dirty up [Johnson].
>
> THE COURT: First of all, the fact that he has ever [been] seen by anyone with a gun, is she prepared to tell you where and when and what date she saw him with a gun?
>
> [DEFENSE COUNSEL]: I think she is prepared to tell me not the exact date but where.
>
> THE COURT: What do you mean where? On his person, at his place?
>
> [DEFENSE COUNSEL]: On his person.
>
> THE COURT: Here is the problem. When the State asked [']did you see him with a gun on that particular day,['] that's a relevant question because that goes to the heart of pure self defense. It may go to the heart of unreasonable self defense, *et cetera*. In your opening statement you obviously indicated that your client will testify that he saw [Johnson] reaching towards something that he thought was a gun. The fact that did one

person ever carry a gun is irrelevant. Number one, we don't know if that person had the right to carry a gun or carried a gun lawfully. Right?

[DEFENSE COUNSEL]: Judge, agree.

THE COURT: What this is doing essentially, [counsel], he carried a gun then so I think you can pretty much believe he carried a gun. It's conjecture. Objection sustained."

¶ 11 Shelton Young also testified on behalf of the State. Young lived across the street from Robinson. On December 8, 2014, Young was watching television at his home when he looked outside of his window. He saw Johnson park a red PT Cruiser and walk toward Robinson's house. He then saw the defendant park a white PT Cruiser and walk toward Johnson. The defendant said something to Johnson that Young could not hear, and Johnson turned and walked toward the defendant. Young noticed the defendant had a gun in his hand. When the two men were about 10 feet apart from each other, the defendant fired the gun at Johnson and missed. Johnson ran between two cars to shield himself. The defendant fired again, and Johnson fell to the ground. The defendant then walked up to Johnson and fired his gun four more times.

¶ 12 Anthony Bates testified that he is the maintenance supervisor for Robinson's townhome complex. Just before 11 a.m. on December 8, 2014, Bates was walking near the house when he saw "two cars racing back and forth down the street," one a burgundy PT Cruiser and the other a white PT Cruiser. He saw the burgundy PT Cruiser eventually stop, and then the white PT Cruiser stop just a few seconds later. Bates recognized the defendant as he "hopped out" of the white PT Cruiser. The defendant walked up to the burgundy PT Cruiser and tried to break several of the car's windows with his elbow but was unsuccessful. The defendant walked back to his car, and Johnson exited the burgundy PT Cruiser. Johnson walked away from the defendant and toward the house. The defendant then fired a gun at Johnson but missed. The defendant chased Johnson between the parked cars and fired a second shot. Johnson fell to the ground. Bates moved toward the defendant and "tried to talk him out of it." As Bates stood in the middle of the street, he saw the defendant walk over to Johnson, who was laying on the ground, and stand over Johnson and shoot him about four or five more times. The defendant then "[l]ooked up and took off running" with his gun. Bates never saw Johnson with a gun.

¶ 13 Detective Dale Potter testified that when he arrived at the scene, Johnson had already been transported to the hospital. He spoke with Bates, who agreed to go down to the police station to speak with him further. At the station, Detective Potter showed Bates an array of compiled photographs. Bates identified the defendant's photograph from the array. Detective Potter then notified the "mission team" of detectives and police officers within the area to look for the defendant. Detective Potter testified that he gave the mission team "personal information that I knew of [the] defendant based on previous arrests." The mission team was unable to locate the defendant. The defendant turned himself in on December 10, 2014, and was arrested.

¶ 14 The State presented a stipulation that the assistant Cook County medical examiner, Dr. Ponni Arunkumar, would testify that she conducted Johnson's autopsy. Dr. Arunkumar determined that Johnson sustained gunshot wounds to his head, left arm, and left hand, and concluded that his cause of death was multiple gunshot wounds. Dr. Arunkumar removed three bullets from Johnson's body, but noted that one of them was removed from his abdomen and was an "old" bullet. The autopsy report did not find evidence of close-range firing.

¶ 15     The State rested its case, and the trial court denied the defendant's motion for a directed finding.

¶ 16                                    The Defendant's Case

¶ 17     The defendant testified in his own behalf. After Robinson told him and Johnson to take the argument outside of the house, Johnson followed and swore at the defendant for trying to have him arrested. Johnson then spit in the defendant's face and punched him in the jaw, knocking out one of his teeth. The defendant swung back at Johnson but missed. Johnson hit the defendant again, knocking him into a gate and breaking it.

¶ 18     The defendant testified that Johnson then got into his car and drove away. The defendant walked down the street to "cool off," but decided to follow Johnson in his car. The defendant planned to wait until Johnson arrived at his destination and then call the police to have them arrest Johnson for assault. Both men eventually drove back to the house and parked. The defendant parked about three cars behind Johnson. The defendant exited his vehicle and looked down at his cell phone to call the police, but right then he saw Johnson "coming towards" him with his right hand in front of his waistband. He thought Johnson was "fixing to shoot" him. Defense counsel questioned the defendant:

> "[DEFENSE COUNSEL]: Why did you think he was looking to shoot you?
>
> [THE DEFENDANT]: Because I know [Johnson] to carry a—
>
> [THE STATE]: Objection.
>
> THE COURT: [Counsel], that will be stricken.
>
> [DEFENSE COUNSEL]: Thank you.
>
> [DEFENSE COUNSEL]: Well, I don't want to know about what you know about in the past. When I say why do you think he was going to shoot you, describe to the jurors why do you think he was going to shoot you, describe what you observed at that point with his hands?
>
> [THE DEFENDANT]: What I observed with his hands in his waist you can see like a little black steel kind of like a frame you see kind of the butt so therefore I know he was going to shoot me."

The defendant testified that he then grabbed his gun and fired in Johnson's direction. He fired more than once, but he did not know exactly how many times. The defendant testified that he shot Johnson "to protect myself. I felt myself threatened. I knew he was going to shoot me." The defendant denied that he went up to Johnson and fired four more shots into his body. After he shot Johnson, he went to Robinson's house to talk to her. He turned himself in to the police a day or two later.

¶ 19     On cross-examination, the defendant testified that while he saw the black steel butt of a handgun in Johnson's waistband, Johnson never took the gun out of his waistband.

¶ 20                              Closing Arguments and Sentencing

¶ 21     In closing arguments, the State described Johnson as fleeing from the defendant and "defenseless" at the time he was shot. The State argued that the shooting was unjustified and described the defendant's version of events as "concocted."

¶ 22    Defense counsel's closing argument focused on the defendant's self-defense claim, arguing that he was justified in shooting Johnson because "he believed he was going to get shot." He highlighted that there was conflicting witness testimony regarding whether Johnson walked toward or away from the defendant just before he was shot. His closing arguments stressed that Johnson had just "pummeled" the defendant during the physical altercation and that the defendant believed Johnson had a gun in his waistband. Defense counsel suggested that Bates could have found the gun on Johnson and then concealed it from the police as an explanation for why no gun was found. Defense counsel further propounded that Johnson perhaps shot himself in the abdomen as he was pulling his gun out of his waistband, since there had been a third "old" bullet found in his abdomen.

¶ 23    Defense counsel alternatively argued to the jury that they should find the defendant guilty of second degree murder on the basis that the defendant did believe that Johnson was going to shoot him, but his belief was unreasonable: "[Y]ou can find a mitigating factor which says that he did what he did out of unreasonable belief. He wasn't reasonably doing what he said. That's second degree."[1]

¶ 24    The trial court instructed the jury on first degree murder, second degree murder, and the affirmative defense of self-defense. The jury deliberated for a little more than an hour before reaching a verdict. The jury found the defendant guilty of first degree murder and that during the commission of a first degree murder he had personally discharged a firearm that caused the death of another person.

¶ 25    Subsequently, the trial court heard and denied the defendant's posttrial motion, which argued that the defendant was not proven guilty of first degree murder, or alternatively, that he should have been found guilty of second degree murder. The trial court stated to defense counsel: "[Y]ou did an extremely competent job seeking [*sic*] that the jury had an alternative version to consider ***. You did your job based on your theory of the case. Twelve of [the defendant's] citizens did not buy into it."

¶ 26    At sentencing, the trial court called the fight between the defendant and Johnson "an argument over a silly bus pass." The court explained that in order to deter others from turning to guns over "nonsense," it was sentencing the defendant to 30 years' imprisonment for first degree murder. The court also sentenced him to 25 years for personally discharging a firearm causing the death of another person, for a total of 55 years' imprisonment.

¶ 27    The defendant filed a motion to reconsider, which the court denied. This appeal followed.

¶ 28                                              ANALYSIS

¶ 29    We note that we have jurisdiction to review the trial court's judgment, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 30    On appeal, the defendant presents the following issues: (1) whether he received ineffective assistance of counsel; (2) whether he was prejudiced by Detective Potter's testimony; and (3) whether the trial court failed to provide proper Rule 431(b) admonishments during

---

[1]"A person commits the offense of second degree murder when *** at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing *** but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2014).

*voir dire*. Because we find the ineffective assistance of counsel issue to be dispositive, we turn to it first.

¶ 31   The defendant argues that he received ineffective assistance of counsel when defense counsel failed to properly elicit state-of-mind testimony from both the defendant and Robinson regarding Johnson's past habit of carrying a gun. The defendant maintains: "Their testimony would have helped explain why [the defendant] reasonably believed that he saw a gun and that using deadly force was necessary to protect himself." Specifically, the defendant takes issue with defense counsel's failure to respond at all when the State objected to his testimony about knowing Johnson's habit of carrying a gun. He also challenges defense counsel's response when the State objected to Robinson's testimony about having seen Johnson carry a gun in the past. The defendant argues that during the sidebar regarding Robinson's testimony, defense counsel improperly made a propensity argument instead of framing it as *corroborative state-of-mind evidence*. The defendant claims that if his and Robinson's state-of-mind testimony had been admitted, "there is a reasonable probability" that the jury would have found that he acted in self-defense, or, in the alternative, found "that his belief was unreasonable" and convicted him of second degree murder instead.

¶ 32   The State counters that the defendant did not receive ineffective assistance of counsel and that the defendant is merely challenging trial strategy. Primarily, the State argues that defense counsel's strategy was to focus on what happened the day of the shooting, and that the defendant cannot "second guess" that strategy on appeal. The State also claims that the testimony at issue would have been excluded under *People v. Lynch*, 104 Ill. 2d 194 (1984), and so defense counsel was not ineffective for failing to elicit inadmissible testimony.

¶ 33   Claims of ineffective assistance of counsel are reviewed through a two-part test that was announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court. *People v. Burrows*, 148 Ill. 2d 196, 232 (1992). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the defendant was prejudiced thereby. *People v. Veach*, 2017 IL 120649, ¶ 30 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36). Prejudice is a reasonable probability of a different result of the proceeding absent counsel's deficiency, and a reasonable probability is probability sufficient to undermine confidence in the outcome. *Id.* A defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not incompetence. *People v. King*, 316 Ill. App. 3d 901, 913 (2000). We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 34   We initially address the State's claim that any testimony regarding Johnson's reputation to carry a gun would not be admissible under *Lynch*. The State avers that Johnson's character was not an essential part of the defendant's self-defense claim and, therefore, defense counsel was not ineffective for failing to elicit testimony about him being known to carry a gun. See *Lynch*, 104 Ill. 2d at 200; *People v. Figueroa*, 381 Ill. App. 3d 828, 841 (2008) (a defendant claiming self-defense may present evidence of the victim's aggressive and violent character because such evidence is relevant to determine which person was the aggressor). However, the defendant's testimony was *not* that Johnson had a propensity for violence; it was that he *knew* Johnson to carry a gun. Thus, *Lynch* is irrelevant.

¶ 35    Instead, the testimony at issue was relevant for the limited and nuanced purpose of representing the defendant's *state of mind* at the time he shot Johnson. Specifically, the defendant's testimony that he *knew* Johnson to carry a gun supports his belief that Johnson was going to shoot him. The testimony, therefore, is relevant to his claim of self-defense—whether or not his belief of imminent harm was reasonable. See *People v. Sims*, 265 Ill. App. 3d 352, 355 (1994) (a defendant's belief that force was necessary is an essential element of his self-defense claim, and thus, a defendant's state of mind at the time of the occurrence is relevant and material); *People v. Cruzado*, 299 Ill. App. 3d 131, 136 (1998) ("When self-defense is raised, testimony concerning the victim's reputation and character may be offered for two distinct purposes. [Citations.] 'One purpose of the testimony may be to show the reasonableness of the defendant's state of mind in acting in self-defense ***.' " (quoting *People v. Buchanan*, 91 Ill. App. 3d 13, 16 (1980)); see also *People v. Lee*, 213 Ill. 2d 218, 225 (2004); *People v. Zertuche*, 5 Ill. App. 3d 303, 305 (1972).

¶ 36    The defendant's knowledge of Johnson's past practice of carrying a gun, coupled with Johnson reaching for what the defendant believed to be a gun in his waistband, was the basis of the defendant's subjective belief that he was going to be shot. This is classic state-of-mind evidence. Whether the belief was reasonable or unreasonable was for the jury to decide, based on the totality of the evidence presented to them. Similarly, the testimony of Robinson, who lived with Johnson and knew of his habit of carrying a gun, would have corroborated the defendant's testimony regarding his belief and state of mind.

¶ 37    Nonetheless, the State predictably claims that defense counsel's failure to properly object was appropriate because his strategy was to focus on the events on the day of the shooting, *i.e.*, that Johnson had just assaulted the defendant and that the defendant believed he saw the butt of a gun in Johnson's waistband. However, the events on the day of the shooting *include* the defendant's state of mind. If the defendant *believed* that he saw the butt of a gun in Johnson's waistband just after Johnson had assaulted him, testimony that Johnson had a habit of carrying a gun would be more than relevant.

¶ 38    While defense counsel's opening and closing statements did focus on the defendant's claim that he saw Johnson running toward him with a gun in his waistband, testimony regarding the defendant's state of mind is not an "alternative theory" or a "different tactic" as the State alleges. That testimony is part and parcel of the defendant's theory of defense. Indeed, state-of-mind evidence goes to the heart of self-defense. *People v. Sawyer*, 115 Ill. 2d 184, 193-94 (1986) ("it is the *defendant's perception* of the danger, not the actual danger, which is dispositive" for purposes of self-defense (emphasis added)). Certainly, the defendant's knowledge that Johnson had a habit of carrying a gun, coupled with the fact that Johnson had just violently beat him, may very well have been the reason that the defendant believed Johnson was going to shoot him. Thus, defense counsel should have properly elicited the defendant's testimony that he *knew* Johnson to carry a gun. That would certainly qualify as admissible state-of-mind evidence.

¶ 39    Defense counsel was also predictably unsuccessful in his attempt to elicit Robinson's testimony that she knew Johnson to carry a gun:

> "[DEFENSE COUNSEL]: I just believe, Judge, I should be able to ask if she ever saw [Johnson] with a gun. They lived together for eight months and it shows he may have possessed a gun at some point and he may have had a gun—if he possessed a gun at some point prior, then he may have had a gun on that day.

THE COURT: That calls for sheer speculation. State['s] response.

[THE STATE]: First of all, in the defendant's opening statement, they indicated that this defendant saw [Johnson] supposedly carrying his waistband as if he had a gun. Thus the question[,] [']did you see [Johnson] on that day carrying a gun.['] Secondly, even if [Johnson] had no criminal background, even if he had a criminal conviction for possession of a gun, case law is clear [that possession] does not go towards violence. It doesn't go to *Lynch* material. This is nothing but to dirty up [Johnson].

THE COURT: First of all, the fact that he has ever [been] seen by anyone with a gun, is she prepared to tell you where and when and what date she saw him with a gun?

[DEFENSE COUNSEL]: I think she is prepared to tell me not the exact date but where.

THE COURT: What do you mean where? On his person, at his place?

[DEFENSE COUNSEL]: On his person.

THE COURT: Here is the problem. Here is the problem. When the State asked [']did you see him with a gun on that particular day,['] that's a relevant question because that goes to the heart of pure self defense. It may go to the heart of unreasonable self defense, *et cetera*. In your opening statement you obviously indicated that your client will testify that he saw [Johnson] reaching towards something that he thought was a gun. The fact that did one person ever carry a gun is irrelevant. Number one, we don't know if that person had the right to carry a gun or carried a gun lawfully. Right?

[DEFENSE COUNSEL]: Judge, agree.

THE COURT: What this is doing essentially, [counsel], he carried a gun then so I think you can pretty much believe he carried a gun. It's conjecture. Objection sustained."

Defense counsel *never* argued that Robinson's testimony was *relevant* to corroborate the defendant's belief and state of mind. For example, when the trial court stated that the propensity argument "calls for sheer speculation," defense counsel could and should have framed the testimony as relevant *state-of-mind* evidence. Instead, defense counsel only continued to argue with the State about propensity and debate whether the testimony would "dirty up" Johnson. It was an incredible error for defense counsel to fail to make the appropriate argument during the sidebar.

¶ 40    The dissent misses the point of our analysis when it asserts that, "[s]tanding alone, whether Robinson had seen Johnson with a gun is not relevant to whether defendant believed that Johnson had a gun." *Infra* ¶ 56. Robinson's testimony that she knew Johnson to have a history of carrying a gun would have *corroborated* the defendant's state-of-mind and his belief that Johnson had a gun on him. See *People v. Evans*, 104 Ill. App. 3d 598, 603 (1982) (the defendant's state-of-mind testimony was corroborated by his cousin who testified that the victim was known to carry a gun).[2]

¶ 41    During oral arguments before this court, the State argued that after the trial court sustained the State's objection to the evidence in question, an offer of proof for the testimony at issue

---

[2] We acknowledge that Robinson's testimony would have been admissible only during the defendant's case to corroborate the defendant's state-of-mind testimony, which we hold should have been admitted.

would have been too remote and uncertain. The State speculates that the trial court would have excluded the testimony as irrelevant. This argument is nonsensical. The defendant's point is that there *never was an offer of proof* for the trial court to consider. When the trial court prevented defense counsel from eliciting the testimony at issue, counsel could and should have made an offer of proof for the record, which would have made it clear *why* he needed to elicit the testimony which the trial court had banned (*i.e.*, the defendant's belief in state of mind). Instead, counsel responded to the State's propensity argument. This had nothing to do with the defendant's state of mind, which should have been the focus of defense counsel's argument. The trial court was never able to consider the relevance of the testimony at issue as it related to the defendant's belief and state of mind. The trial court excluded the evidence based on the State's propensity argument, but defense counsel had a duty to make an offer of proof based on the defendant's belief, and therefore, state-of-mind relevance.

¶ 42        Defense counsel argued to the jury that they could alternatively find the defendant's belief that Johnson was about to shoot him to be unreasonable and therefore find him guilty of second degree murder. Yet, defense counsel failed to provide the jury with any evidence by which to find the defendant guilty of second degree murder. Significantly, when defense counsel had the opportunity to elicit the testimony at issue by framing it as state-of-mind evidence which would be relevant to finding the defendant's belief unreasonable and therefore supporting a finding of second degree murder, he failed to do so. Instead of succeeding in having the defendant's belief and state-of-mind testimony admitted and using it to argue that the defendant unreasonably believed he was about to be shot, defense counsel made two speculative and incredible arguments. First, he suggested that Bates may have taken Johnson's gun after the shooting and concealed it from the police. Then, he suggested that Johnson may have accidentally shot himself in the abdomen. Both of those arguments are beyond comprehension.

¶ 43        The State highlights that the trial court commended defense counsel's performance at the end of the trial. However, that is not dispositive of whether the defendant received effective assistance of counsel. The sole relevant inquiry is whether defense counsel's performance was objectively unreasonable under prevailing professional norms. And as we have discussed, defense counsel in this case failed to even *attempt* to have the trial court admit the defendant's state-of-mind testimony which would support his belief, and was crucial to his defense; or to a finding of second degree murder under these facts.

¶ 44        Further, the record reflects that Dr. Arunkumar's autopsy report did not find evidence of close-range firing. Yet, defense counsel made no mention of this fact, even when he was arguing during his closing arguments that the defendant did not shoot Johnson at close range. Defense counsel's failure to highlight that the autopsy report did not find evidence of close-range firing, especially under the facts of this case, underscores his deficient performance. Had defense counsel made the proper argument to lay the foundation for the defendant's belief and state-of-mind testimony, coupled with pointing out to the jury that there was no autopsy evidence of close-range firing, the jury would certainly have had the entirety of the theory of defense upon which to make a determination. However, they were deprived of that opportunity.

¶ 45        The defendant had a right to expect defense counsel to *understand, explain, and apply* the rules of evidence to the facts of his case in support of his theory of defense, no matter how nuanced that interpretation may be. Defense counsel in this case clearly did not. Rather, he allowed the State to distract him from arguing the state-of-mind application of the relevant testimony; choosing instead to follow the State down the wrong path and responding to the

- 10 -

State's propensity argument regarding the testimony. At no point in the argument regarding *why* the testimony was necessary did defense counsel *ever* mention the defendant's belief and state of mind as the basis for the trial court to consider why the testimony was needed. That, after all, was the crux of the defense.

¶ 46    Having determined that defense counsel's performance was objectively deficient and unreasonable, we now parse whether the defendant was prejudiced.

¶ 47    Given the fact that no gun was found on Johnson or at the crime scene, this case turned on whether the jury accepted the defendant's belief that Johnson was going to shoot him as reasonable. On one hand, Johnson had just knocked out one of the defendant's teeth and hit the defendant with such force that the defendant's body broke a gate to the building. And one witness testified that Johnson was walking *toward* the defendant when he was shot.[3] On the other hand, no gun was found on Johnson, and one witness testified that Johnson was walking *away* from the defendant when he was shot. In such a close case, and in light of conflicting testimony, the defendant's belief and state of mind were crucial. Testimony from the defendant and Robinson that they knew Johnson to have a habit of carrying a gun would have shown the case in a different light and could have tipped the scales with respect to the defendant's state of mind, and therefore, belief (unreasonable or otherwise) that Johnson was going to shoot him. See *People v. Morales*, 2019 IL App (1st) 160225, ¶ 36 (a defendant need not prove by a preponderance of the evidence that the outcome would have been different, only that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict).

¶ 48    Without the relevant state-of-mind evidence, the core of the defendant's case was not put before the jury, thereby denying the defendant the opportunity to effectively mount his defense. This was error, occasioned by defense counsel's failure to make a clear, coherent argument to the trial court regarding the true use of the evidence, which the court excluded. Consequently, the trial court never got the opportunity to consider the testimony in that context. Specifically, that based on the defendant's knowledge of Johnson's habit of carrying a gun, the defendant *believed* Johnson was going to shoot him. The jury should have been allowed to hear *why* he had that belief. They would then be free to accept or reject it; but it was error to keep it from them. This deprived the defendant of a fair trial.

¶ 49    We agree with the defendant that there is a reasonable probability that the jury would have found him either not guilty or guilty only of second degree murder had the state-of-mind testimony been admitted and argued. Thus, the defendant was prejudiced by defense counsel's performance. See *People v. Moore*, 356 Ill. App. 3d 117, 128 (2005) ("the prejudice component of *Strickland* requires the defendant show the deficient representation rendered the trial result unreliable or the proceeding fundamentally unfair"). Accordingly, we find that the defendant received ineffective assistance of counsel. We, therefore, reverse the judgment of the circuit court of Cook County and remand the case for a new trial.

¶ 50    In light of the preceding analysis, we need not address the defendant's additional arguments that he was prejudiced by Detective Potter's testimony and that the trial court failed to provide proper Rule 431(b) admonishments during *voir dire*.

---

[3]Not to mention, the autopsy report found no evidence of close-range firing, which defense counsel should have, but did not, highlight.

¶ 51                                CONCLUSION

¶ 52        For the foregoing reasons, we reverse the defendant's conviction and sentence, and remand the case to the circuit court of Cook County for a new trial.

¶ 53        Reversed and remanded.

¶ 54        JUSTICE CONNORS, dissenting:

¶ 55        Because I would find that defendant did not show that his counsel was ineffective, I respectfully dissent. As the majority notes, a defendant claiming ineffective assistance of counsel must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Neither prong was met here.

¶ 56        Testimony that Johnson was known to carry a gun would have been relevant to defendant's self-defense theory. See *People v. Lee*, 213 Ill. 2d 218, 225 (2004) (in support of a self-defense claim, several witnesses testified that the victims were known to carry guns and were involved in various shootings); *People v. Sims*, 265 Ill. App. 3d 352, 356 (1994) (alleged fact that the victim carried a gun and pulled it out during a confrontation was probative of the defendant's state of mind).Yet, the majority oversteps its role by finding that defense counsel should have argued differently when he sought to admit Robinson's testimony about whether she had ever seen Johnson with a gun. Standing alone, whether Robinson had seen Johnson with a gun is not relevant to whether defendant believed that Johnson had a gun. The majority notes in passing that Robinson's testimony would only be admitted if defendant's state-of-mind testimony was already admitted. That being the case, the majority seems to fault defense counsel for not laying the groundwork for admitting Robinson's testimony, later eliciting from defendant whether he knew that Johnson carried a gun, and then hypothetically recalling Robinson to offer the desired testimony that she had seen Johnson with a gun. To require that sequence of actions risks micromanaging an attorney's trial strategy. And, the majority's view appears to be swayed by hindsight, which we are supposed to avoid. See *People v. French*, 2017 IL App (1st) 141815, ¶ 67 (" '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight' ") (quoting *Strickland*, 466 U.S. at 689). The majority has applied a standard to defense counsel's conduct that is far above what *Strickland* mandates.

¶ 57        Further, in evaluating counsel's performance, a "court must consider the totality of counsel's conduct, not isolated incidents." *People v. Wilson*, 392 Ill. App. 3d 189, 198 (2009). Numerous times, defense counsel elicited evidence of defendant's state of mind. Indeed, defendant testified about his state of mind four times, twice stating, "I thought he was fixing to shoot me," and also stating that "I know he was going to shoot me" and "I felt my life was threatened." Defendant also testified that Johnson had his hand in his waistband and he saw black steel. Defense counsel highlighted the self-defense theory in closing argument. The jury was presented with defendant's state of mind throughout the trial. Based on the entire trial, defense counsel's performance was not "so inadequate that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011).

¶ 58        In a similar vein, I would also find that defendant failed to meet the prejudice prong of *Strickland*. Under the *Strickland* standard, a defendant must show that, but for counsel's

- 12 -

deficient performance, the result of the proceeding would have been different. *People v. Steele*, 2014 IL App (1st) 121452, ¶ 38. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Further, the defendant must show "actual prejudice" and "not simply speculation that the defendant may have been prejudiced." *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 46. Evidence of defendant's state of mind—that he feared for his life and believed Johnson had a gun—was repeatedly brought out at trial. I am not convinced that the additional testimony would have made a sufficient difference. The jury was presented with defendant's theory and rejected it. Defendant has not shown that counsel's failure to admit the desired evidence "rendered the result of the trial unreliable or the proceeding fundamentally unfair." (Internal quotation marks omitted.) *Manning*, 241 Ill. 2d at 327. Ultimately, a defendant is entitled to "a fair trial, not a perfect one" and "competent, not perfect, representation." *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Based on the record before us, I believe defendant received all that *Strickland* required.

¶ 59     For the foregoing reasons, I would not reverse and remand based on this issue, and I respectfully dissent in this case.